UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION



**********************************************************

| | | |
|---|---|---|
| JAMES KIESZ, | * | CIV 05-1043 |
| | * | |
| Plaintiff, | * | |
| | * | |
| -vs- | * | MEMORANDUM OPINION |
| | * | AND ORDER |
| GENERAL PARTS, INC., doing business as | * | |
| CARQUEST, a foreign corporation, | * | |
| | * | |
| Defendant, | * | |
| | * | |

**********************************************************

## INTRODUCTION

Plaintiff, James Kiesz, filed a complaint, on October 11, 2005, alleging the following four counts: (1) defendant failed to pay plaintiff overtime in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 211(c); (2) defendant breached its employment contract with plaintiff by failing to timely offer plaintiff the opportunity to obtain healthcare benefits; (3) defendant negligently caused plaintiff emotional distress by failing to properly pay overtime and to provide insurance coverage to plaintiff; and (4) defendant defamed plaintiff through slanderous comments made to other local merchants. Plaintiff also filed a motion to amend the complaint (Doc. 29), pursuant to Fed. R. Civ. Pierre. 15(b), to conform to the facts should the Court find the Employee Retirement Income Security Act ("ERISA") applies.

Defendant filed a motion for summary judgment claiming (1) plaintiff's overtime claims pursuant to FLSA are time barred by the applicable statute of limitations or he has otherwise failed to set forth prima facie claims as to certain time periods; (2) plaintiff's breach of employment contract claim and negligent infliction of emotional distress claim are preempted by ERISA; (3) plaintiff cannot establish a necessary element of his negligent infliction of emotional distress claim; and (4) plaintiff's defamation claim is time barred by the applicable statute of limitations or he has otherwise failed to show that non-privileged defamatory statements were made.

## FACTUAL BACKGROUND

Defendant is a distributor of replacement automotive parts, supplies, and tools for every make and model of foreign and domestic car, truck, bus, and farm or industrial vehicle. Headquartered in Raleigh, North Carolina, defendant operates more than 3,400 auto parts stores and 41 distribution centers throughout North America. Additionally, with 23,000 employees and with annual sales of over $2 billion, defendant sells its parts to "do-it-yourself" mechanics, professional installers, body shops, farmers, and fleet owners.

Defendant's Aberdeen, South Dakota, location generated annual sales figures of approximately $2 million and was staffed by seven hourly employees during plaintiff's term of employment (November 5, 2001, to October 10, 2003). When the military called up one of these full-time hourly employees for active duty, in October 2001, Matt Johnson ("Johnson"), the then Aberdeen store manager, interviewed plaintiff for this position. After the interview process, Johnson offered the position to plaintiff. Plaintiff accepted and commenced work on November 5, 2001. His principal job duties consisted of checking in freight, taking customer orders, pulling special parts orders, answering the telephone, and completing and filing paperwork concerning price discrepancies and warranty papers. For these duties, plaintiff was paid $7.50 per hour. In March 2003, this pay rate was increased to $8.00 per hour. Plaintiff resigned from the company effective October 10, 2003.

## DECISION

### I.    Summary Judgment Standard

The summary judgment standard is well known and has been set forth by this court in numerous opinions. *See* Hanson v. North Star Mutual Insurance Co., 1999 DSD 34 ¶ 8, 71 F.Supp.2d 1007, 1009-1010 (D.S.D. 1999), Gardner v. Trip County, 1998 DSD 38 ¶ 8, 66 F.Supp.2d 1094, 1098 (D.S.D. 1998), Patterson Farm, Inc. v. City of Britton, 1998 DSD 34 ¶ 7, 22 F.Supp.2d 1085, 1088-89 (D.S.D. 1998), and Smith v. Horton Industries, 1998 DSD 26 ¶ 2, 17 F.Supp.2d 1094, 1095 (D.S.D. 1998). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pierre. 56(c); Donaho v. FMC Corporation, 74 F.3d 894, 898 (8th Cir. 1996). The United States Supreme Court has held that:

> The plain language of Rule 56(c) mandates the entry of summary judgment
> . . . against a party who fails to make a showing sufficient to establish the
> existence of an element essential to that party's case, and on which that
> party will bear the burden of proof at trial.  In such a situation, there can be
> "no genuine issue as to any material fact," since a complete failure of
> proof concerning an essential element of the non-moving party's case
> necessarily renders all other facts immaterial.

Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  "A material fact dispute is genuine if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party."  Landon v. Northwest Airlines, Inc., 72 F.3d 620, 634 (8th Cir. 1995).  "[T]he burden on the moving party may be discharged by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case."  Celotex Corporation v. Catrett, 477 U.S. at 325, 106 S.Ct. at 2554.  Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324, 106 S.Ct. at 2553.  In considering the motion for summary judgment, this Court must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from the facts.  Donaho, 74 F.3d at 897-98.  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

II.     **FLSA Claim**

        A. **Prima Facie Case**

        Plaintiff instituted this action claiming, among other things, violations of the FLSA overtime provisions, 29 U.S.C. § 207.  Plaintiff has a private right of action against his former employer and jurisdiction is proper under 29 U.S.C. § 216(b).

        The FLSA requires that covered employees be paid one and one half times their regular hourly rate for hours worked in excess of forty per week.  *See* 29 U.S.C. § 207(a)(1).  An employee who brings suit under the FLSA for unpaid overtime compensation and liquidated damages "has the burden of proving that he performed work for which he was not properly

3

compensated." <u>Anderson v. Mt. Clemens Pottery Co.,</u> 328 U.S. 680, 687, 66 S. Ct. 1187, 1192, 90 L.Ed. 1515 (1946), and <u>Marshall v. Truman Arnold Distributing Co.,</u> 640 F,2d 906, 911 (8th Cir. 1991). Plaintiff must make a prima facie case by a preponderance of the evidence, showing the following elements: (1) there existed an employer-employee relationship; (2) there was engagement in activities within the coverage of the act; (3) the employer violated the wage requirements; and (4) a definite amount of compensation is due. <u>Flight v. Armour and Company,</u> 533 F. Supp. 998, 1004 (W.D. Ark. 1982) (<i>citing</i> <u>Johnson, et al. v. Dierks Lumber and Coal Company,</u> 130 F.2d 115, 118 (8th Cir. 1942)). For the purposes of establishing liability, it is sufficient to show the amount and the extent of work as a matter of just and reasonable inference. <u>Anderson,</u> 328 U.S. at 687-688, 66 S. Ct. at 1192. Moreover, "when an employer has failed to keep proper records, courts should not hesitate to award damages based on the 'just and reasonable inference' from the evidence presented." <u>Martin v. Tony & Susan Alamo Found.,</u> 952 F.2d 1050, 1052 (8th Cir. 1992) (<i>citing</i> <u>Anderson,</u> 328 U.S. at 687, 66 S.Ct. at 1192), <u>Mumbower v. Callicott,</u> 526 F.2d 1183, 1187 (8th Cir. 1975) (in absence of statutorily required time records, court relied upon employee recollections to compute back wages for employee who "had her own key to the premises and served as her own supervisor"), and <u>Reich v. Department of Conservation & Natural Resources,</u> 28 F.3d 1076, 1082 (11th Cir. 1994) (a court need only inquire whether, under the circumstances, the employer either had knowledge of overtime hours being worked or had the opportunity through reasonable diligence to acquire knowledge). Once plaintiff has met his burden, the burden shifts to the employer to negate the reasonableness of the inference. <u>Idaho Sheet Metal Works v. Wirtz,</u> 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966).

Concerning damages, the FLSA provides for liquidated damages equal to the amount of actual damages. <i>See</i> 29 U.S.C. § 216(b). An award of liquidated damages "is mandatory unless the employer can show good faith and reasonable grounds for believing that it was not in violation of the FLSA." <u>Braswell v. City of El Dorado,</u> 187 F.3d 954, 957 (8th Cir. 1999). The back wages and liquidated damages are compensatory in nature and the punitive damages are penal. <i>See</i> <u>Brooklyn Sav. Bank v. O'Neil,</u> 324 U.S. 697, 707, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), and <u>Reich v. Southern New England Telecommunications,</u> 121 F.3d 58, 71 (2d Cir.

4

1997).  Liquidated damages under the FLSA, 29 U.S.C. §§ 201-219 (1994), "constitute [ ]
compensation for the retention of a workman's pay which might result in damages too obscure
and difficult of proof for estimate other than by liquidated damages." Brooklyn Sav. Bank, 324
U.S. at 707, 65 S.Ct. 895.  The term "liquidated damages" in the FLSA is "something of a
misnomer" because it is not a sum certain amount determined in advance, rather it is "a means of
compensating employees for losses they might suffer by reason of not receiving their lawful
wage at the time it was due."  Reich, 121 F.3d at 70 fn. 4 (internal quotations and citations
omitted).  If, however, "the employer shows to the satisfaction of the court that the act or
omission giving rise to such action was in good faith and that he had reasonable grounds for
believing that his act or omission was not a violation of the Fair Labor Standards Act . . . the
court may, in its sound discretion, award no liquidated damages or award any amount thereof not
to exceed the amount specified in 29 U.S.C. § 216."  29 U.S.C. § 260; see also Cross v. Arkansas
Forestry Com'n, 938 F.2d 912, 917 (8th Cir. 1991), and Barrentine v. Arkansas-Best Freight
System, Inc., 750 F.2d 47, 51 fn. 5 (8th Cir. 1984).

      Defendant's employees track and record their work time in a computer based system.
Employee time entries are reported on a daily, weekly and monthly basis.  However, only the
daily time sheets reflect the actual time that the employee punched in and out.  These entries are
keyed in by employees who enter them under their company assigned employee identification
number.  Managers have the ability to edit these employee entries to make changes.  After
making any changes, the store manager prints out, on duplicate paper, the time entries.
Employees then sign the weekly time sheets to verify the hours they worked.  One copy is then
kept in an end-of-day procedures binder within the store and another copy is sent to defendant's
Lakeville, Minnesota, distribution center.

      From November 2001 to April 2003, even though he had no set work schedule and he did
not keep an independent record of the hours that he worked, plaintiff claims that he regularly
worked Monday through Friday from 6:00 a.m. to 5:30 p.m., and occasionally on Saturday.  He
claims that he worked on average between 45 to 60 hours per week during this period.  Plaintiff
claims he was not paid for hours in excess of 40 hours per week.  As a result, he decided to
confront Johnson.  Johnson, according to plaintiff, acknowledged that he "shorted" plaintiff on

his hours and that he modified plaintiff's time entries to report those hours in other weeks. After confronting Johnson twice, plaintiff reported being told by Johnson to go home when his eight hours were up.

Johnson testified at his deposition that he could not honestly remember how much overtime plaintiff regularly worked, but thought it was probably eight to twelve hours a week. He acknowledged that there may be overtime hours, which plaintiff worked and for which he was not paid. Based on his calculations, he believed the company probably owed the plaintiff 21 to 28 hours of overtime during this period; he did not know for sure. He also stated that if plaintiff has other numbers concerning hours of overtime worked, plaintiff's numbers would be more accurate.

Minimizing employee overtime hours was a point of management emphasis, according to Johnson. Johnson's regional manager, Archie Goodrich ("Goodrich"), regularly scolded him for allowing his employees overtime to exceed the "payroll expectations" established for the Aberdeen store. Although the Aberdeen store consistently exceeded overtime expectations, Johnson was never given the freedom to hire another employee to reduce the work load. When he was asked about paying plaintiff overtime out of his own pocket, he stated he could not recall, but if he had done it then it would have only been once. He also stated that he never told others plaintiff was not paid for hours that he was working.

Concerning time sheet editing, Johnson admitted doing it two or three times, possibly four times. He acknowledged editing time sheets in order to fix "problems" and to move time from one day to another. According to Johnson, it was not done to deprive plaintiff of overtime hours.

In April 2003, Johnson resigned due to concerns over how the company was addressing plaintiff's issues and due to his poor relationship with Goodrich. Ron Webber ("Webber") became the new store manager effective May 5, 2003. During this management transition period, plaintiff and another employee managed the store. For the first two weeks of this interim period, no one did the end-of-day procedures for time reporting. For the following two week period, plaintiff and another employee alternated doing the end-of-day procedures. Plaintiff claims that when he looked in the end-of-day procedures binder, he noticed time records were missing for

January, February, and April of 2003.  Plaintiff became concerned and called Goodrich, who said that he did not know where the records were.

Sometime during this management transition period, Customer Service Manager Cindy Perry ("Perry") received a phone call from either plaintiff or from Human Resources Manager Stacy Pexa ("Pexa") about allegations of an employee working "off the clock."  Perry met with plaintiff, talked to other employees, and looked through store records.  Although she did not take notes or remember what persons she talked with, she said that other employees were not aware of anyone working "off the clock."  She never discussed these allegations with Johnson, who was being cooperative with the company after his resignation, because she believed that Goodrich had already spoken with him about this issue.  Goodrich had reportedly told her that Johnson was denying the allegations and that he had no knowledge of the missing paperwork.  When she looked at the store records, she realized time sheets were missing.  To her knowledge, those time sheets were never found.  After her visit she requested all payroll records from the accounting department for the entire period of time that plaintiff worked for the defendant.  The accounting department was unable to located the missing time sheets.

In her discussions with plaintiff during her store visit, she asked plaintiff what was the amount of unpaid overtime the company needed to pay him.  Plaintiff responded he did not know, but that he had retained an attorney and would get back to them.  He also told her that he did not keep any independent track of hours because he trusted Johnson.

On April 29, 2003, plaintiff recorded a telephonic meeting among plaintiff, Goodrich, Perry, and another person, presumably without their knowledge.  Perry told plaintiff that Johnson denied any agreement with plaintiff concerning overtime.  She asked plaintiff later what Johnson had told him as far as how he was going to compensate him for unpaid overtime.  Plaintiff responded that he thought Johnson was going to either pay him later or roll it over into the next week.  She then asked him why he would agree to this.  Plaintiff responded by saying that he trusted Johnson and that Johnson told him that, if the store had a lot of overtime, Johnson would get in a lot of trouble.  Also, during the conversation, Goodrich asked plaintiff, just out of curiosity, if plaintiff thought Goodrich knew about the overtime issues.  Plaintiff responded that

7

some days he thought that Goodrich knew and other days he did not.  Goodrich told plaintiff that he did not know this was happening.

When Webber took over he created work schedules for all the employees and reduced employees' overtime hours.  As a result of this change, from May 2003 to October 2003, plaintiff allegedly infrequently worked overtime hours.  During his deposition, Webber denied that he ever engaged in the practice of moving an employee's work hours from one day to another day.

Viewing the facts in the light most favorable to the plaintiff, plaintiff has established a prima facie case that there existed an employer-employee relationship and that he engaged in activities within the coverage of the Act.  Defendant acknowledges possible wage violations during the period of October 11, 2002, through March 31, 2003.  Johnson admitted that there may be overtime hours which plaintiff worked and for which he was not paid.  Further, Johnson admitted to engaging in the practice of rolling hours.  Plaintiff has established a prima facie case that his employer violated the wage requirements.

Defendant denies any wage violations between March 31, 2003, and October 10, 2003.  Defendant asserts wage violation claims from this period are not substantiated by admissible evidence.  Defendant claims that plaintiff's allegations are contradicted by his own testimony and by the testimony of others.  Plaintiff testified that he did not work much overtime and that his hours were not rolled or unaccounted for while Weber managed the Aberdeen store.  Weber was introduced as the new manager to the employees in April, 2003, and he assumed his duties on May 5, 2003.  Weber testified that he kept his employees on a regular work schedule and that employees' hours were not rolled.

Genuine issues of material fact exist as to whether wage violations occurred prior to Weber's assumption of the management on May 5, 2003.  There are no "genuine" issues of material fact as to any wage violations from May 5, 2003, to the end of plaintiff's employment with defendant and defendant is entitled to partial summary judgment as to any alleged wage violations on or after May 5, 2003.

The final element required for a prima facie case is whether plaintiff satisfied the burden of proving a definite amount of compensation due.  It is difficult for plaintiff to prove wage violations when defendant fails to preserve time records.  We know that, for the purposes of

establishing liability, it is sufficient to demonstrate the amount and the extent of work as a matter of just and reasonable inference from the evidence presented. <u>Anderson,</u> 328 U.S. at 687-688, 66 S. Ct. at 1192. We also know, in the absence of statutorily required records, courts have relied upon the employee's recollection to compute back wages. <u>Mumbower,</u> 526 F.2d at 1187. Defendant argues plaintiff cannot satisfy this burden.

Plaintiff testified that from November 2001 to April 2003, even though he had no set work schedule and he did not keep an independent record of the hours that he worked, he regularly worked Monday through Friday from 6:00 a.m. to 5:30 p.m., and occasionally on Saturday. Additionally, his recollection was that he worked on average between 45 to 60 hours per week during this period. We know that Johnson engaged in editing time records. Defendant maintained time records with the exception of three months. From this evidence, a jury could employ some method to determine a definite amount of compensation due to plaintiff.

The record, if viewed in the light most favorable to the non-moving party and giving that party the benefit of all reasonable inferences, presents a genuine issue of material fact as to this element. Genuine issues of material fact preclude summary judgment on plaintiff's FLSA claim.

## B. FLA.'s Statute of Limitations

Defendant claims plaintiff's FLSA claim is time barred by the FLSA's statute of limitations. The FLSA has a two year statute of limitations for all actions to collect unpaid overtime; however, wilful violations of the FLSA have a three year statute of limitations. 29 U.S.C. § 255(a). For a violation to be wilful, a plaintiff must show that the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA." <u>McLaughlin v. Richard Shoe Co.,</u> 486 U.S. 128, 130 (1988), and <u>Simpson v. Merchs. & Planters Bank,</u> 441 F.3d 572, 580 (8th Cir. 2006). The wilful violations standard requires more than mere negligence or a good-faith but erroneous assumption that a pay plan complied with the FLSA. <u>McLaughlin,</u> 486 U.S. at 135. The employee's cause of action accrues when an employer fails to pay required compensation for any workweek at the regular payday for the period in which the workweek ends. <u>Mid-Continent Petroleum Corp. v. Keen,</u> 157 F.2d 310, 316 (8th Cir. 1946). The limitations period begins to run from the time the defendant takes the allegedly unlawful actions and plaintiff learns of them. <u>O'Connell v. Champion Intern. Corp.,</u> 812 F.2d 393, 394

(8th Cir. 1987).  The period ends when plaintiff "commences" his action.  *See Id.*; 29 U.S.C. § 255.

Plaintiff seeks recovery of overtime wages for the period from November 5, 2001, to October 10, 2003.  Plaintiff filed his complaint October 11, 2005.  Defendant argues that (1) any claims that accrued prior to October 11, 2003, are time-barred by the two year period of limitations, and (2) any claims that accrued prior to October 11, 2002, are time-barred if the three year period of limitations applies.  Plaintiff argues that the defendant willfully violated FLA. provisions, invoking the three-year statute of limitations and rendering his wage claims from October 2002 to October 2003 timely.  Plaintiff contends also that equitable doctrines should be applied to cover the entire wage claim.

As a preliminary point, the Court notes  that "[s]tatutes of limitations are not arbitrary obstacles to the vindication of just claims, and therefore they should not be given a grudging application.  They protect important social interests in certainty, accuracy, and repose."  Cada v. Baxter Healthcare Corp., 920 F.2d 446, 452-53 (7th Cir. 1990); *see also* Union Pacific R. Co. v. Beckham, 138 F.3d 325, 330 (8th Cir. 1998).

To properly evaluate the parties' contentions, the court must first determine when plaintiff's wage claims accrued.  Accrual is the date that the statute of limitations begins to run. Cada., 920 F.2d at 450, and Dring v. McDonnell Douglas Corp., 58 F.3d 1323, 1327 (8th Cir. 1995).  It is not the date on which the wrong that injures plaintiff occurs but the date (often the same) when plaintiff discovers the injury.  *Id.*; O'Connell, 812 F.2d at 394.  The accrual date, in this case, is co-terminus with the date that the alleged wrong occurred, *i.e.*, the date the plaintiff was paid and knew that he was not paid for the hours he worked during the previous pay period. Accordingly, if the appropriate limitations period is the normal two years, all plaintiff's wage claims would be time barred.[1]

Plaintiff alleges that the defendant willfully violated the FLA.  Plaintiff points to several instances, which he believes constitute willful violations.  First, Johnson edited plaintiff's hours

---

[1] Plaintiff terminated his employment with defendant on October 10, 2003.  Therefore, plaintiff's last paycheck may be within the two year statute of limitations, depending on the defendant's pay periods.

within the employee time-keeping system.  According to Goodrich, these actions are inconsistent with company practices.  Defendant is, of course, liable for the acts and omissions of a manager.  Second, Goodrich knew or had reason to know that Johnson was not paying plaintiff for the overtime which he had worked.  Further, other managers acknowledged there may be overtime hours for which plaintiff was not paid and nothing was done to remedy the matter.  Third, the defendant failed to maintain and keep time records at the Aberdeen store and the Lakeville, Minnesota, distribution center.

The court agrees with plaintiff that these instances, if true, could constitute willful violations.  For example, the Sixth Circuit has held that the failure to maintain proper business records can be used as evidence of a willful violation of the FLA.  Morgan v. Francois, 2006 WL 3032162 (E.D.Mo. 2006) (citing Elwell v. Univ. Hosp. Home Care Servs., 276 F.3d 832, 844 (6th Cir. 2002).  Also, defendant's illicit or questionable business practices, including classifying an employee as part-time even though the employer continually schedules that employee to work full-time, and engaging in editing an employee's time records so that the records do not accurately reflect the hours the employee worked, may be viewed as willful violations.  Viewing the facts in the light most favorable to the non-moving party and giving that party the benefit of all reasonable inferences, the court finds that a genuine issue of material fact exists as to whether the defendant's conduct willfully violated the FLA., precluding summary judgment of claims accruing on or after October 11, 2002.

### C.  Equitable Tolling

Plaintiff asserts that even if his wage claim is subject to the two year statute of limitations, the doctrines of equitable tolling and estoppel and the continuing violations theory should be applied to cover his entire wage claim.  The court will address each of these doctrines in turn.

The doctrine of equitable tolling has its roots in the discovery rule, long applied to fraud cases.  See Holmberg v. Armbrecht, 327 U.S. 392, 396-97, 66 S.Ct. 582, 584-85, 90 L.Ed. 743 (1946).  Recently, the Supreme Court restated the rationale underlying the doctrine of equitable tolling: " '[W]here the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is

11

discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party.' " <u>Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson</u>, 501 U.S. 350, 363, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991) ( *quoting* <u>Bailey v. Glover</u>, 88 U.S. (21 Wall.) 342, 348, 22 L.Ed. 636 (1875)). In essence, "[t]his doctrine focuses on the employee's ignorance of a claim, not on any possible misconduct by the employer, and tolls the limitations period when the plaintiff, despite all due diligence, is unable to obtain vital information bearing on the existence of his claim. Stated differently, the question is, whether a reasonable person in the plaintiff's position would have been aware that her rights had been violated." <u>Henderson v. Ford Motor Co.</u>, 403 F.3d 1026, 1033 (8th Cir. 2005) (*citing* <u>Dring v. McDonnell Douglas Corp.</u>, 58 F.3d 1323, 1328-1329 (8th Cir. 1995) (*quoting* <u>Chakonas v. City of Chicago</u>, 42 F.3d 1132, 1135 (7th Cir. 1994) (internal quotations omitted)). Equitable tolling is not an excuse to be invoked by those failing to exercise reasonable diligence. *See* <u>Baldwin County Welcome Ctr. v. Brown</u>, 466 U.S. 147, 152, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984). In short, "[e]quitable tolling is appropriate only when the circumstances that cause a plaintiff to miss a filing deadline are out of his hands." <u>Hill v. John Chezik Imports</u>, 869 F.2d 1122, 1124 (8th Cir. 1989), and <u>Heideman v. PFL, Inc.</u>, 904 F.2d 1262, 1266 (8th Cir. 1990).

Despite diligence on his part, plaintiff maintains that he was unable to obtain necessary information from his former employer for his claim. Plaintiff did not keep independent records of the hours he worked. As a result of this and the employer's missing records, he was unable to determine the amount of unpaid overtime owed to him. The court is unpersuaded by this argument.

The employee's burden is slight. However, while the information would have been helpful to plaintiff's claim, it was not essential or vital to his claim. The circumstances causing plaintiff to miss the filing deadline were not out of his hands. Further, plaintiff was represented by counsel. Tolling is even less appropriate in a case where the petitioner is represented by counsel. <u>Kreutzer v. Bowersox</u>, 231 F.3d 460, 463 (8th Cir. 2000). Counsel failed to preserve plaintiff's claim by filing suit or by obtaining an agreement to toll the statute of limitations. It is well-settled that a party is bound by the acts of her attorney. *See* <u>Link v. Wabash Railroad Co.</u>,

12

370 U.S. 626, 634, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962). Finally, "[a]ny invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes." Jihad v. Hvass, 267 F.3d 803, 806 (8th Cir. 2001) (*quoting* Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000)). Accordingly, the doctrine of equitable tolling should not be employed to preserve plaintiff's claim beyond the appropriate statutory period. There are no genuine issues of material fact as to the doctrine in this case.

### D. Equitable Estoppel

The doctrine of equitable estoppel focuses on the defendant's conduct. Garfield v. J.C. Nichols Real Estate, 57 F.3d 662, 666 (8th Cir. 1995). "Equitable estoppel presupposes that the plaintiff knows of the facts underlying the cause of action but delayed filing suit because of the defendant's conduct." Bell v. Fowler, 99 F.3d 262, 266 (8th Cir. 1996). The doctrine "comes into play when a defendant takes active steps to prevent a plaintiff from suing on time." Chakonas v. City of Chicago, 42 F.3d 1132, 1136 (7th Cir. 1994) (*citing* Cada v. Baxter Healthcare Corp., 920 F.2d 446, 450 (7th Cir. 1990), and Garfield, 57 F.3d at 666. "The party requesting the estoppel must show that the defendants have engaged in 'affirmative conduct . . . that was designed to mislead or was unmistakably likely to mislead' a plaintiff." Bell, 99 F.3d at 268-69 (8th Cir. 1996) (*quoting* Garfield v. J.C. Nichols Real Estate, 57 F.3d 662, 666 (8th Cir. 1995)) (*citing* Dring v. McDonnell Douglas Corp., 58 F.3d 1323, 1329 (8th Cir. 1995)). Moreover, the doctrine of equitable estoppel should only be applied in *exceptional* circumstances. Redman v. U.S. Bus. Resources, Inc., 153 F.3d 691, 696 (8th Cir. 1998) (emphasis added).

While plaintiff concedes that the "look-back date" would normally be the date the complaint was filed, he contends, in this case, his employer took actions that the employer should have understood would cause him to delay filing, and equitable estoppel should extend the date of the claim back to November 5, 2001. *See* Kriegesmann v. Barry-Wehmiller Co., 739 F.2d 357, 359 (8th Cir. 1984) ("'The statute of limitations will not be tolled on the basis of equitable estoppel unless the employee's failure to file in timely fashion is the consequence either of a deliberate design by the employer or of actions that the employer should unmistakably have

13

understood would cause the employee to delay filing his charge.' ") (*quoting* <u>Price v. Litton Business Systems, Inc.</u>, 694 F.2d 963, 965 (4th Cir. 1982)), and <u>Hamilton v. West</u>, 30 F.3d 992, 994 (8th Cir. 1994) (finding equitable estoppel not warranted where plaintiff failed to introduce evidence that defendant acted "pursuant to a 'deliberate design' or an unmistakable understanding that [plaintiff] would delay filing his charges."). Plaintiff's argument is not persuasive. Exceptional circumstances are not present. Further, there was no dispute as to the existence of plaintiff's cause of action. Finally, plaintiff's attorneys were responsible to diligently pursue plaintiff's claims. Accordingly, the doctrine of equitable estoppel should not be employed to preserve plaintiff's claim beyond the appropriate statutory period. There are no genuine issues of material fact as to the doctrine in this case.

### E. Continuing Violations Doctrine

"When an employer is accused of an ongoing practice that began prior to the statute of limitations period, the claim may nonetheless be timely under the 'continuing violation' doctrine." <u>Ashley v. Boyle's Famous Corned Beef Co.</u>, 66 F.3d 164, 168 (8th Cir. 1995). This doctrine is applied in two types of cases. " The first includes cases in which the original violation occurs outside the statutory period but which is closely related to subsequent violations that are not time-barred." <u>Hendrix v. Yazoo City</u>, 911 F.2d 1102, 1103-04 (5th Cir. 1990), and <u>Smith v. Ashland, Inc.</u>, 250 F.3d 1167, 1172 (8th Cir. 2001). A plaintiff with this type of case may recover for all violations on the theory that they constitute one continuing type of violation. *Id.* The second type of case involves an initial violation that also occurs outside the statutory period but which is repeated later. *Id.* In this type of case, each subsequent violation triggers a new statute of limitations period as to that violation and recovery may be had for those violations occurring within a period of limitations. *Id.* Plaintiff's case falls into the second category.

As previously alluded to, overtime claims, by their very nature, are continuing claims. An overtime claim accrues and constitutes a separate cause of action at the end of each pay period that the employer fails to pay the claimed overtime. *See* 29 U.S.C. § 255(a); <u>Keen</u>, 157 F.2d at 316. So, the repeated failure to properly compensate an employee for overtime is not treated as one ongoing violation, but as repeated violations. Recovery for repeated violations is limited to violations that occur within the statutory period for those particular events.

14

In short, plaintiff's attempt to avoid the statute of limitations for all alleged violations by arguing that the violation was part of a continuous "policy or practice" is unavailing.  Plaintiff can only recover for the repeated violations that occurred within the appropriate statutory period.

Genuine issues of material fact do not exist concerning the question of whether the doctrines of equitable tolling and estoppel, and the continuing violations theory should be applied to cover plaintiff's entire wage claim.  They should not.  Accordingly, the defendant's motion for summary judgment as to these issues should be granted.  Defendant's motion for summary judgment as to wage claims accruing before October 11, 2002, should also be granted.

## III.   Breach of Contract Claim

When Johnson offered the position to plaintiff, it was re-classified from a full-time to a part-time position[2].  Johnson re-classed the position because he was discouraged from having full-time employees due to extra benefit and retirement costs to the company.

While the employment application indicated the position offered was part-time and Johnson claims that he told plaintiff the position was part-time, plaintiff maintains that he was unaware it was part-time until after the employer's ninety day probationary period expired.  Plaintiff claims that when he originally inquired about his classification and benefits, Johnson told him that he was next in line for full-time benefits.  Over the next year, when plaintiff asked Johnson about his benefits and his "change of status"[3], Johnson repeatedly told plaintiff it was coming and it was just awaiting Goodrich's final approval.

----

[2] A regular part-time employee is defined, in the company's associate handbook, as "any associate who is scheduled to work a regular schedule that averages at least 20 hours per week, but less than a full-time schedule, on a regular basis."  A regular full-time employee is defined, in the company's associate handbook, as "any associate who is regularly scheduled to work 40 or more hours per week."   The defendant's payroll system does not provide information to anyone above the local store manager when an employee works more than 40 hours on a consistent basis and is nevertheless classified as a part-time employee.

[3] "Change of status" refers to the company's procedure for switching an employee's status from part-time to full time.  The company's general procedure is for the store manager to initiate the change of status paperwork.  Once completed, the paperwork is forwarded to the regional manager for final approval.

Plaintiff alleges that he told Johnson in October 2002 that, if Johnson wanted plaintiff to remain an employee, then plaintiff needed to have his benefits by his employment anniversary date of November 5, 2002. Plaintiff followed-up again on November 18, 2002, and Johnson told him that the insurance papers were on the way. When plaintiff received the benefits envelope, the only thing enclosed was a provider list. Plaintiff called Pexa, on November 27, 2002, about this and to check the status of the healthcare enrollment paperwork. Pexa replied that she had not received his change of status paperwork yet.

Plaintiff alleged that, on December 3, 2002, Goodrich approached plaintiff and said plaintiff's benefit paperwork should arrive any day. Plaintiff's change of status occurred on December 12, 2002, and was made retroactive effective to December 1, 2002. Goodrich stated that he told plaintiff that he should sign the benefit paperwork right away because they had to back date it to make it effective December 1. Pexa did not recall when she sent out his enrollment package.[4] She remembers, however, calling plaintiff twice to remind him that the enrollment paperwork needed to be returned within 30 days for him to be enrolled in the plan. Plaintiff did not send in the enrollment paperwork within the 30 day time frame required for a December 1, 2002, start date. According to his testimony, plaintiff did not receive his insurance enrollment paperwork until January 2003. We take that to be true for the purposes of the motion.

Plaintiff contacted both Pexa and Perry to complain about not being enrolled. Perry contacted the corporate benefits office and spoke to them regarding plaintiff. The corporate benefits office is responsible for managing the defendant's benefit plan and for making any exception decisions for the defendant's plan. Perry told corporate benefits that plaintiff claimed that he did not receive the enrollment information and that he had some pretty serious medical issues. The corporate benefits office enrolled plaintiff after the call. They were able to enroll him through open enrollment with coverage starting in January 2003 even though the open enrollment period was held in November. He was also added without having any signed forms. The forms were filled out by corporate benefits on his behalf. Generally, they do not make

---

[4] Pexa subsequently changed company procedures. Employee benefit packages are now sent only by certified mail.

exceptions when employees miss the enrollment deadline and they could only do this because they company has a "self insured" plan.

Plaintiff also spoke to Perry about coverage for his past medical bills. She told him that, in order to back date his coverage, he would need to pay back premiums. Thus, instead of paying premiums out of his monthly paycheck, he would be required to pay them in a lump sum. Defendant's corporate benefits office back dated his medical enrollment form to February 5, 2002. Plaintiff did not pay the back premiums.

Plaintiff claims defendant breached its employment contract with him by failing to timely re-classify him as full time and offer him the opportunity to obtain medical insurance benefits which were available to full time employees. He seeks damages for the cost of medical care which would have been paid by insurance.

Defendant seeks summary judgment on the breach of employment contract claim and the negligent infliction of emotional distress claim[5] on the basis that (1) plaintiff's state law claims are preempted by ERISA; and (2) plaintiff has failed to exhaust his administrative remedies as required by ERISA.

### A. ERISA Preemption

ERISA, 29 U.S.C. § 1001 et. seq. (1988), provides for exclusive jurisdiction of most civil actions coming within the coverage of the statute in federal district courts. 29 U.S.C. § 1132(e)(1). The Act covers, among other things, "employee welfare benefit plans" or welfare plans, which are defined as:

> any plan, fund, or program . . . established or maintained by an employer, or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services . . . . 29 U.S.C.A.§ 1002(1); ERISA § 3(1).

---

[5]Defendant contends plaintiff's negligent infliction of emotional distress claim is really a claim for failure to provide group health insurance benefits and is therefore preempted. Because defendant is entitled to summary judgment on the negligent infliction of emotional distress claim on another basis, discussed below, I will not address preemption of that claim.

17

ERISA preempts state laws, including common law contract claims, to the extent they "relate to any employee benefit plan" as defined by the statute. *See* 29 U.S.C. § 1144(a); Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 47-48, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). "State law" is defined as "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1). "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97, 103 S.Ct. 2890, 2899-2900, 77 L.Ed.2d 490 (1983), and Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 139, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990). Under this "broad common-sense meaning," a state law may "relate to" a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect. *See* McClendon, 498 U.S. at 139. 111 S.Ct. at 483, 112 L.Ed.2d at 484, Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 525, 101 S.Ct. 1895, 1907, 68 L.Ed.2d 402 (1981), and Pilot Life, 481 U.S., at 47, 107 S.Ct., at 1552-53. Finally, preemption is also not precluded simply because a state law is consistent with ERISA's substantive requirements. Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 739, 105 S.Ct. 2380, 2388-89, 85 L.Ed.2d 728 (1985).

The Eighth Circuit has identified seven factors to consider in determining whether a state law claim has a connection to an employee benefit plan: whether the state law (1) negates an ERISA plan provision, (2) affects relations between primary ERISA entities, (3) impacts the structure of ERISA plans, (4) impacts the administration of ERISA plans, (5) has economic impact on ERISA plans, (6) whether preemption of the state law is consistent with other ERISA provisions, and (7) whether the state law is an exercise of traditional state power. *See* Wilson v. Zoellner, 114 F.3d 713, 717 (8th Cir. 1997), and Arkansas Blue Cross & Blue Shield v. St. Mary's Hosp., Inc., 947 F.2d 1341, 1344-45 (8th Cir. 1991).

Notwithstanding its breadth, federal courts have recognized limits to ERISA's preemption clause. Under the plain language of § 514(a) the Supreme Court has held that only state laws that relate to benefit plans are pre-empted. Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 23, 107 S.Ct. 2211, 2223, 96 L.Ed.2d 1 (1987). For example, even though a state law required payment of severance benefits, which would normally fall within the purview of ERISA, it was not

18

preempted because the statute did not require the establishment or maintenance of an ongoing plan. *Id.*, at 12, 107 S.Ct., at 2217-18.

Plaintiff's breach of contract claim does not come within the ambit of ERISA, so as to be possibly preempted. First, plaintiff was not immediately eligible to participate in defendant's benefit plan. ERISA affords no rights or protection to those who are not participants or beneficiaries. *See* ERISA § 502(a)(1), (3) and (c), 29 U.S.C.A. § 1132(a)(1), (3) and (c). An ERISA plan "'participant' is naturally read to mean either 'employees in, or reasonably expected to be in currently covered employment,' or former employees who 'have . . . a reasonable expectation of returning to covered employment' or who have 'a colorable claim' to vested benefits." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 117, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Defendant classified plaintiff as a part-time employee and, under defendant's plan, a part-time employee is not eligible to participate in the company benefit plan.

Second, ERISA was not intended to be construed so broadly as to protect employers from legal recourse for their actions that were taken in knowing violation of state law. *See generally* Egelhoff v. Egelhoff, 532 U.S. 141, 147, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001). Defendant's conduct potentially violated state employment laws (e.g. breach of the obligation to pay wages). These state law claims may be encompassed in plaintiff's breach of contract claim. *See* SDCL 60-11-7.

Third, an employee may rely on state law to redress claims such as breach of an employment contract and fraud, notwithstanding the presence of an ERISA plan, if the factual basis of the suit is independent of the rights and duties created by the plan. *See* Krause v. Dresser Indus., Inc., 910 F.2d 674, 676 (10th Cir. 1990), Wilcott v. Matlack, Inc. 64 F.3d 1458, 1463-1464 (10th Cir. 1995) (claims not preempted by ERISA were those which involved alleged misrepresentations by an employer that related to plaintiff's employment, but which had nothing to do with an alleged misrepresentation regarding benefits), Thurkill v. The Menninger Clinic, Inc., 72 F.Supp.2d 1232, 1236 (D.Kan. 1999), and Straub v. Western Union Telegraph Co., 851 F.2d 1262, 1264 (10th Cir. 1988) (holding that plaintiff's claims were preempted involving alleged misrepresentations about the benefits themselves). The court must therefore focus on the factual basis of plaintiff's state law breach of contract claim. In the instant case, the focus of

19

plaintiff's suit is independent of the rights and duties created by the plan.  Plaintiff's breach of contract claim is more extensive than the defendant's failure to provide benefits.  When defendant classified plaintiff as a part-time employee, plaintiff lost important rights.  For example, promotional opportunities available to part-time employees are not as favorable as those available generally to full-time employees.  Additionally, full-time employees generally have the certainty of working a set amount of hours, while part-time employees do not.  Further, part-time employees generally do not receive the vacation time and employment perks that full-time employees enjoy.

Finally, the Eighth Circuit factors are not applicable or relevant to plaintiff's state law breach of contract claim.  For example, plaintiff's breach of contract does not negate any ERISA plan provision or affect the relations between primary ERISA entities.  Also, it does not impact the structure or administration of ERISA plans.  Plaintiff's state law breach of contract claim is not preempted by ERISA largely because plaintiff was not a participant in defendant's plan and because plaintiff's state law claim is not factually related to ERISA.  The defendant's motion for summary judgment based on preemption should be denied.

### B.  ERISA Exhaustion

The United States Court of Appeals for the Eighth Circuit has held that "although ERISA itself contains no exhaustion requirement, beneficiaries must exhaust their administrative remedies if such exhaustion is mandated by the ERISA plan at issue." Burds v. Union Pacific Corp., 223 F.3d 814, 817 (8th Cir. 2000).  It is well established that, when exhaustion is clearly required under the terms of an ERISA benefits plan, the plan beneficiary's failure to exhaust his administrative remedies bars him from asserting any unexhausted claims in federal court. *Id.* But, "ERISA plan beneficiaries are not required to exhaust their claims if they can demonstrate that exhaustion 'would be wholly futile.'" Burds., 223 F.3d at 817 fn.4 (*citing* Glover v. St. Louis-San Francisco Ry., 393 U.S. 324, 330, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969)).  Having said this, plaintiff, in this case, is not required to exhaust ERISA because the Court found ERISA does not apply to this lawsuit.  Thus, there is no ERISA exhaustion requirement in this action.  Defendant's motion for summary judgment based upon exhaustion should be denied.

### IV.   Negligent Infliction of Emotional Distress Claim

In March 2002, plaintiff saw a physician relating to pain that he was experiencing in his chest and rib cage. The physician diagnosed him with lymphadenopathy.[6] Plaintiff's condition worsened over the next several months. The source of the pain was determined to be caused by chronic cholecystitis.[7] On December 30, 2002, plaintiff underwent surgery to remove his gallbladder. On May 27, 2003, plaintiff underwent a colonscopy. After these procedures, plaintiff continued to complain about abdominal pain. This pain apparently recurred episodically. Plaintiff reported the pain was very intense when it came on and lasted anywhere from several to forty five minutes. On March 22, 2004, his physician recommended that he repeat the colonscopy. The physician also noted reflux symptoms during this appointment. On June, 24, 2004, plaintiff went to the Sioux Valley Clinic, and the physician noted plaintiff's abdominal pain was constant and not episodic, as it was before. The physician's medical opinion was that his problems were caused by chronic functional abdominal pain.

Plaintiff claims that his medical condition was exacerbated by the stress caused by his employer's failure to pay him his outstanding overtime and failure to provide him with benefits. Plaintiff's counsel has submitted to the court a battery of plaintiff's medical records. However, plaintiff did not provide any expert medical testimony to support the claim that his condition is brought on or aggravated by stress. Instead, plaintiff asserts, if his case is allowed to go forward, his treating physicians will testify consistently with the medical records, which he says indicate that he suffered physical symptoms as a result of the distress inflicted by his employer's conduct.

South Dakota recognizes the tort of negligent infliction of emotional distress ("NIED"). *See* Wright v. Coca Cola Bottling Co., 414 NW2d 608 (S.D. 1987). Any recovery, however, must be based on the manifestation of physical symptoms. *See* First National Bank v. Drier, 1998 SD 1, ¶12, 574 NW2d 597, 600. The physical symptoms, in turn, must be casually

---

[6] Lymphadenopathy is a swelling of one or more of a person's lymph nodes. The lymph nodes are the bean-shaped organs found in the underarm, groin, neck, chest, and abdomen that act as filters for the lymph fluid as it circulates through the body.

[7] Cholecystitis is inflammation of the gallbladder, a small organ near the liver that plays a part in digesting food. Normally, a fluid called bile passes out of the gallbladder on its way to the small intestine. If the flow of bile is blocked, it builds up inside the gallbladder, causing swelling, pain, and possible infection.

connected to the emotional distress. *See* <u>Nelson v. WEB Water Development Ass'n, Inc.</u>, 507 NW2d 691, 699 (S.D. 1993) ( a case in which I represented the plaintiff). As the state supreme court has explained, the "physical consequences" requirement is based on at least three principal concerns:

> (1) the problem of permitting legal redress for harm that is often temporary and relatively trivial; (2) the danger that claims of mental harm will be falsified or imagined; and (3) the perceived unfairness of imposing heavy and disproportionate financial burdens on a defendant who was only negligent, for consequences which appear remote from the "wrongful" act.

<u>Brown v. Youth Services Intern. of South Dakota, Inc.</u>, 89 F.Supp.2d 1095, 1104 (D.S.D. 2000) (*citing* <u>Wright</u>, 414 NW2d at 610) (*quoting* Prosser & Keeton on the Law of Torts, § 54 at 360 (5th ed. 1988))). Plaintiff must demonstrate there was a "temporal relationship" and "perhaps" a causal relationship between the plaintiff's symptoms and the employer's failure to pay overtime or to provide insurance benefits; that is, the ailment being experienced by the plaintiff "developed at the time [he was] undergoing this psychic stress." *See* <u>Ginaitt v. Haronian</u>, 806 F.Supp. 311, 321 (D.R.I. 1992). Finally, as is true with all negligence based causes of action, the defendant must have owed plaintiff a duty of care and have breached it. *See* <u>Wright</u>, 414 NW2d at 610 (*quoting* from the Restatement (Second) of Torts § 436).

        In support of his NIED claim, plaintiff contends that he suffered emotional distress causally related to the employer's failure to pay overtime and to provide insurance coverage which, in turn, aggravated a pre-existing physical condition. While this may be true, plaintiff has not supplied sufficient evidence which would substantiate that his physical symptoms were causally connected to the claimed emotional distress. In addition, "[i]f this cause of action were to be allowed to go forward, competent expert medical testimony based on reasonable medical certainty or probability would ultimately be required to link up any physical manifestations claimed by plaintiff with the emotional distress." <u>Locke v. United States</u>, 215 F.Supp.2d 1033, 1041 (D.S.D. 2002). "It would necessarily be beyond the common knowledge of the fact finder whether any such physical manifestations were caused by and were traceable to the claimed emotional distress." *Id.* Plaintiff cannot provide this evidence because discovery in this case closed on June 2, 2006, and plaintiff did not supply any medical evidence in this regard. Nor has

plaintiff sought additional time to do so.  Plaintiff's claim should not be permitted to proceed because there are no genuine issues of material fact as to claims of this type.  The defendant's motion for summary judgment as to this count should be granted.

## V.    Defamation Claim, In General

Whenever a store changes managers, the company inventories the products they have on hand versus what they have on the books.  This process is also done on an annual basis.  After Johnson resigned, an inventory tie-out took place, in Aberdeen, on June 24, 2003.  The initial results showed an inventory shortage of $80,000.  A recount was done and the number decreased to $50,000.  Due to this large inventory discrepancy, Bonita Kramer ("Kramer"), a regional security manager, was assigned to look into the inventory shortage.

Kramer's principal duties, during this time, were to conduct store audits and investigations of inventory losses, and potential employee theft.  She has been in the fraud investigation field for 25 years.  The scope of her responsibilities in this investigation, as she understood it, was to compile documentation and send them to Ted Garfield ("Garfield"), another regional security manager, so he could conduct an audit.  On these documents, she flagged issues that might be concerns but did not reach any ultimate conclusions.  She stated that, when they are auditing the stores, they are not looking for theft, but for questionable transactions.

Her July 23, 2003, updated audit findings listed plaintiff's name with the notation, $1,300 plus of questionable cash and warranty transactions.  She also noted that the company needed to be cautious with its approach due to the lawsuit plaintiff brought against them for unpaid overtime and medical expenses.  She stated, "it could be perceived as we are digging up things on him . . . payback!"  The findings also noted that she received invoices from accounting and needed to reconcile them with engine sales and engine core returns.

Following up on her updated audit findings, Kramer contacted Marshall Engines and determined that four engine cores may not have been returned from one of the Aberdeen store's customers, Speed Pro Tire ("Speed Pro").  The Aberdeen store transacted over $75,000 a year in business with this customer while Johnson managed the store.  Unfortunately, during this time Speed Pro began experiencing financial problems.  Recognizing these problems, Johnson

instituted a new policy whereby the Aberdeen store would not bill Speed Pro for engine cores [8] when it sold them engines, since Speed Pro was a cash customer and collected money from customers on a daily basis. Speed Pro was the only account handled in this manner by the Aberdeen store. All others were billed as sales were made. According to Kramer, deducting the engine core cost from the customer invoice, without having received the engine core back, was contrary to company policy.

Around the time of Kramer's investigation, Johnson said he heard through his "rumor mill" that the company was blaming plaintiff for stealing the missing cores. Supposedly, plaintiff was teaming up with his father, who operated an automotive business, to steal engines, rebuild them and sell them. Johnson said he heard this from two or three people.

Kramer called Speed Pro twice to inquire about the missing cores. She originally talked with Dalen Nelson ("Nelson"), who owned and operated Speed Pro. Nelson and Kramer gave contrasting versions of their conversations. According to Nelson, the conversations focused on plaintiff and his relationship to the missing engine cores. Nelson felt Kramer purposefully asked questions, which were designed to get him to say that plaintiff was somehow involved with the missing engine cores. He said every time she mentioned plaintiff's name it was in reference to whether he was responsible for picking up the cores and if he did pick up the cores. He emphasized that Kramer kept suggesting plaintiff had already picked up the missing cores. His clear impression was that she was insinuating that plaintiff had done something wrong. Nelson reportedly told her that plaintiff had nothing to do with engines and engine cores and that those were typically handled by Johnson. He also stated that they had only one engine core, which was laying in the back of the shop, and she could come get it, if she wanted. Kramer then reportedly asked about the other two engine cores and he told her that he had no idea what she was talking about. The conversation then became heated and ended on a sour note. Sometime after the call

---

[8] An engine core is the old engine (bare block, the cast), which is removed from the vehicle. The engine core is used to rebuild an engine. Customers are generally invoiced for both the new engine and the core. A credit is then given to the customer for the return of the engine core, which is then sent back to the manufacturer. Cores are generally valued between $170 to $1,300.

ended, he found two other engine cores that Kramer mentioned but he thought they were worthless. These engine cores were returned to the Aberdeen store.

According to Kramer's version, she asked him if Speed Pro had any engine cores that they had not returned to the Aberdeen store and if he could check around to see if they had any. Nelson reportedly said that he had one engine core in his shop from the Aberdeen store. She inquired then whether it was possible that he had more because her records showed the Aberdeen store had sold three more to Speed Pro. Nelson replied that he would look around. Kramer acknowledged that she may have brought up plaintiff's name because she believed he was managing the store at the time. Further, she mentioned that she throws in names, as a general practice, as part of her normal fact finding process. Her claimed purpose was to refresh the person's recollection. Kramer admitted that she was aware of plaintiff's lawsuit when she called Speed Pro, that she knew Johnson had not charged for the cores, and that she knew plaintiff was never in a position not to charge for cores.

After Kramer's call, Nelson called plaintiff and described to plaintiff the conversation he just had with Kramer. Nelson told plaintiff that Kramer kept insinuating that plaintiff had something to do with missing engine cores. That evening plaintiff stopped by Speed Pro to speak with Nelson further about the conversation with Kramer. Nelson again told plaintiff that Kramer kept insinuating that plaintiff had something to do with missing engine cores and this was even after Nelson told her that plaintiff had nothing to do with the engine cores and that Johnson would have handled all the transactions.

Kramer's second call with a Speed Pro employee took place about a week after her conversation with Nelson. Nelson was not available when she called, so she spoke with Brett Freeman ("Freeman"). Freeman's description of his conversation with Kramer was similar to the description that Nelson provided. In short, Freeman said he was asked substantially the same questions about plaintiff that Kramer asked Nelson.

About a month after Kramer's original conversation with Nelson, Garfield called Nelson. Garfield allegedly also asked Nelson whether plaintiff was the person who normally picked up the cores from Speed Pro. Nelson noted the call with Garfield was not confrontational like his conversation with Kramer.

Kramer's August 6, 2003, audit results again listed plaintiff's name and noted $603 in suspect transactions relating to him. After Garfield completed the Aberdeen store audit, the company decided to charge $40,000 in missing inventory against the store's profit and discontinue doing business with Speed Pro. The company also wrote off $6,336.62 in losses attributed to Speed Pro.

### A.    False and Unprivileged Communication

South Dakota's statutory definition of defamation encompasses both libel and slander. SDCL 20-11-2. SDCL 20-11-4 provides in pertinent part:

> Slander is a *false* and *unprivileged publication*, other than libel, which: . . . (3) [t]ends directly to injure him in respect to his office, profession, trade, or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profit; . . . (5) [by natural consequence, causes actual damage (emphasis added).

"The truth of a defamatory statement is measured by the ordinary implication of the words at the time the statement was made . . ." Guilford v. Northwestern Public Service, 581 NW2d 178, 180 (SD 1998). The truth or falsity of a disputed statement is an issue for the trier of fact. Schaffer v. Spicer, 215 NW2d 134, 138 (SD1974). So, in the context of a summary judgment motion, the court must determine whether a reasonable fact finder could determine that a statement constituted a false assertion of objective fact. Gateway, Inc. v. Companion Products, Inc., 2002 DSD 27 ¶ 86, 320 F.Supp.2d 912, 930 (D.S.D. 2002).

Certain statements which accuse a person of a crime are libelous per se in South Dakota. Fendrich v. Lauck, 307 NW2d 607 (SD 1981), and Williams v. Hobbs, 131 NW2d 85 (SD 1964).

Privilege is always a defense to a defamation cause of action but it is lost in some cases if the speaker acts with malice. Sparagon v. Native American Publishers, Inc., 1996 SD 3, ¶ 25, 542 NW2d 125, 132. A privileged communication is statutorily defined by SDCL 20-11-5(3), which provides:

> [a] privileged communication is one made: in a communication, without malice, to a person interested therein, by one who is also interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information[.]

26

"This provision is merely declaratory of the general doctrine of qualified privilege which exists independently of any statute." Gustafson v. General Motors Acceptance Corp., 470 F.2d 1057, 1059 (8th Cir. 1973) (*quoting* Parr v. Warren-Lamb Lumber Co., 236 NW 291, 293 (SD 1931)).

The statute presents issues of fact in the present case.

The test for determining whether a communication is privileged under SDCL 20-11-5(3) involves an inquiry into the individuals or circumstances involved. Peterson v. City of Mitchell, 499 NW2d 911, 915-16 (SD 1993) (*citing* Uken v. Sloat, 296 NW2d 540, 542-43 (SD 1980)). "An infallible test in determining whether a communication . . . is or is not privileged is to ask whether, if true, it is a matter of proper public interest in relation to that with which it is sought to associate it." *Id.* (*quoting* McLean v. Merriman, 175 NW 878, 880 (SD 1920)). The South Dakota Supreme Court has also cited the Restatement (Second) of Torts with approval in determining whether the communication was made to an interested person:

> An occasion makes a publication conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know.

*See* Tibke v. McDougall, 479 NW2d 898, 905 (SD1992) (*quoting* Restatement (Second) of Torts § 596 (1986)), Sparagon, 542 NW2d at 132, and Kieser v. Southeast Properties, 1997 SD 87 ¶ 14, 566 NW2d 833, 837.

As to private parties, if a communication is privileged, any recovery requires proof of malice. Paint Brush Corp. v. Neu, 1999 SD 120 ¶ 53, 599 NW2d 384, 398. Under the statute, " '[m]alice cannot be presumed; the party bearing this burden of proof must establish that there was a reckless disregard for the truth on the part of the accused.' " Ruple v. Weinaug, 328 NW2d 857, 860 (S.D. 1983). " 'The real test of whether a defendant's conduct is reckless so as to constitute actual malice is whether he in fact entertained serious doubts as to the truth of his publications.'" Kieser, 566 NW2d at 838. "Reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." Janklow v. Viking Press, 459 NW2d 415, 419 (S.D. 1990) (*quoting* St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968)). Indeed, the failure to investigate, without more, does not constitute malice. Peterson, 499 NW2d at 916. The proof of

27

mere negligence is insufficient as a basis for determining the existence of slanderous remarks. Gustafson v. General Motors Acceptance Corp., 337 F.Supp. 406, 409 (D.S.D. 1972) (*citing* Williams v. Hobbs, 131 NW2d 85 (1964)). The Supreme Court has long held that plaintiff has the burden of proving actual malice that destroys the privilege. Sparagon, 542 NW2d at 132.

Plaintiff alleges defamatory remarks about plaintiff were communicated to local merchants by Kramer. Specifically, the claims deal with statements made to Nelson and to Freeman insinuating that plaintiff took defendant's property and gave it to Speed Pro or others without billing them for it. These could be accusations of plaintiff having committed crimes. Plaintiff asserts Kramer knew that plaintiff had nothing to do with the missing cores prior to speaking with Nelson. Further, even if she was unaware that these statements were false prior to speaking with Nelson, she certainly knew this to be the case after speaking with him. Also, Kramer certainly did not need to repeatedly insinuate wrongdoing by plaintiff after being informed by Nelson that plaintiff had nothing to do with the missing cores or to do the same with Freeman.

In addition, the plaintiff claims that not only were Kramer's statements false, they were also unprivileged because they were made with malice. They were malicious because Kramer communicated "facts" which she knew or had reason to know were false. Kramer was repeatedly told by Nelson and Freeman that plaintiff had nothing to do with the missing engine cores, yet she persisted in raising the issues. Nelson's statements at a minimum should have provided adequate notice to Kramer that plaintiff had nothing to do with the missing cores and that she should not have kept insisting to the contrary. Consequently, Kramer's remarks to local merchants may have defamed plaintiff.

Defendant contends the statements made by their agents were not defamatory because they were both truthful and privileged. Viewing the facts in the light most favorable to the plaintiff and giving the plaintiff the benefit of all reasonable inferences, genuine issues of material fact exist. A reasonable fact finder could find that defendant made statements outside the defendant company claiming that the plaintiff engaged in wrong-doing, perhaps criminal acts, that defendant's statements to local merchants were false, not privileged or, if privileged, were malicious. Genuine issues of material fact preclude summary judgment. Accordingly, summary

28

judgement at to this count should be denied.  This leaves for a determination whether these claims are barred by the applicable statute of limitations.

### B.      Limitations

Defendant contends that plaintiff has failed to assert his defamation claims within the two year statute of limitations set forth in SDCL 15-2-15(1).  The claimed defamatory comments were made in July or August 2003.  The complaint was not filed until October 11, 2005.

Plaintiff contends that he did not have knowledge of his defamation claim (because defendant denied making defamatory comments) and therefore the period of limitations should be equitably tolled.  He further contends that he was induced by settlement negotiations to delay in filing his complaint and, therefore, defendant should be equitably estopped from raising the limitations defense.

There is no genuine issue of material fact as to whether plaintiff knew about Kramer's alleged insinuations that plaintiff had stolen the missing engine cores on the date that Kramer first spoke with Nelson.  Nelson called plaintiff the same day and they later spoke in person about the conversation.  On September 4, 2003, plaintiff's counsel sent a letter to defendant's counsel, alleging that Kramer's alleged actions amounted to defamation.  There is clearly no basis for equitable tolling in this case.

The record is clear that the parties were exchanging correspondence regarding settlement or mediation of plaintiff's claims.  On August 2, 2005, then counsel for plaintiff sent counsel for defendant a copy of the summons and complaint and requested that defendant admit service before August 25, 2005, or the summons and complaint would be served upon defendant.  The waiver of service was not signed until October 19, 2005.  The attorney for the defendant did waive any defense based upon a defect in the service of the summons.  Presumably, defendant has waived any claim that the summons was not personally served upon defendant.

Some lawyers are under the mistaken impression that a lawyer for a party can legally admit service for the client of a summons and complaint.  That is not the law in South

Dakota unless the lawyer is also a registered agent or officer or director of the corporation. Here, there is no such showing. In addition, the lawyer for defendant made no promises as to having anyone admit service or when that would be done.

Federal lawsuits are initiated by the filing of a complaint. Fed. R. Civ. Pierre. 3. There is nothing pending in federal court until the complaint is filed. In contrast, state court actions are commenced in South Dakota by service of the summons, either with or without the complaint. SDCL 15-2-30. The South Dakota rule is quite unusual. It allows the lawyer to not file the complaint until a later date. The date of service of the summons is used to judge whether the action has been timely filed within the requirements of South Dakota statutes of limitations. The United States Supreme Court has held that "in diversity actions Rule 3 governs the date from which various timing requirements of the Federal Rules begin to run, but does not affect state statutes of limitations." Walker v. Armco Steel Corp., 446 U.S. 740, 751, 100 S.Ct. 1978, 1985, 64 L.Ed.2d 659 (1980).

> In contrast to Rule 3, the [South Dakota] statute is a statement of a substantive decision by that State that actual service on, and accordingly actual notice by, the defendant is an integral part of the several policies served by the statute of limitations. The statute of limitations establishes a deadline after which the defendant may legitimately have peace of mind; it also recognizes that after a certain period of time it is unfair to require the defendant to attempt to piece together his defense to an old claim. A requirement of actual service promotes both of those functions of the statute. It is these policy aspects which make the service requirement an "integral" part of the statute of limitations . . . As such, the service rule must be considered part and parcel of the statute of limitations. Rule 3 does not replace such policy determinations found in state law.

Walker v. Armco Steel Corp., 446 U.S. at 751-52, 100 S.Ct. at 1985-86.

Do any genuine issues of estoppel exist? Estoppel has been explained by the South Dakota Supreme Court as follows:

> We have previously recognized that a party may be estopped from asserting the statute of limitation defense based on his acts or conduct. An estoppel arises where one party, by acts or conduct, induces another party to do that which he would not otherwise have done, and is thereby prejudiced. In *Taylor v. Tripp*, 330 N.W.2d 542 (S.D.1983), we expressed the elements of equitable estoppel as follows:

30

> In order to constitute an equitable estoppel, also known today as estoppel in pais, false representations or concealment of material facts must exist; the party to whom it was made must have been without knowledge of the real facts; th[e] representations or concealment must have been made with the intention that it should be acted upon; and the party to whom it was made must have relied thereon to his prejudice or injury.  There can be no estoppel if any of these essential elements are lacking, or if any of them have not been proved by clear and convincing evidence.
>
> Other courts have applied the theory of estoppel to prevent a defendant from lulling a plaintiff "into a false sense of security" that service was effective, and the limitation period met.  A defendant cannot egregiously lead the plaintiff to believe that service was sufficient and then delay until the statute of limitation has run. To do so would allow a defendant to plead the very delay caused by his course of conduct as an affirmative defense.

<u>Cooper v. James</u>,  2001 SD 59,¶16 - 17, 627 NW2d 784, 789 (S.D. 2001).

There are no genuine issues as to estoppel in this case.  Continuing negotiations without more certainly does not toll the application of the statute of limitations.  After all, plaintiff was represented by a lawyer who was presumed to know what the law required.

Clearly, the complaint had to be filed by September 4, 2005, to avoid the statute of limitations as to the defamation claims.  It was not timely filed and such claims are now barred.

## ORDER

Based upon the foregoing,

IT IS ORDERED:

(1)    Defendant's motion for summary judgment (Doc. 18) as to plaintiff's Fair Labor Standards Claim is granted in part and denied in part.  Summary judgement is granted as to wage claims accruing prior to October 11, 2002, and as to claims accruing after May 5, 2003.  Summary judgment is denied as to wage claims accruing on or between October 11, 2002, and May 5, 2003.

(2)    Defendant's motion for summary judgment (Doc. 18) as to plaintiff's breach of contract claim is denied.

(3)    Defendant's motion for summary judgment (Doc. 18) as to plaintiff's negligent infliction of emotional distress claim is granted.

31

(4)    Defendant's motion for summary judgment (Doc. 18) as to plaintiff's defamation

claim is granted because any such claims are barred by the South Dakota statute of

limitations.

(5)    Plaintiff's motion to amend (Doc. 29) is denied, as moot.

Dated this 27th day of March, 2007.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____ DEPUTY

(SEAL)

32